IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KATHY STRATTON                    )
                                  )
                                  )
            Plaintiff,            )
                                  )
      v.                          )          1:23CV95(CCE)(JEP)
                                  )
CITY OF KANNAPOLIS, et al.,       )
                                  )
            Defendants.           )

ORDER AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

This civil rights action is before the Court on the Motions to Dismiss of various state

and municipal entities and officials based in North Carolina and Maryland. For the reasons

set out below, the undersigned recommends that the Court (1) grant the Motions to Dismiss

of Defendants Bagwell, Beswick, Botfort, Charles County, Cupples, Fields, Harmon, Harris,

Hart, Jerry, and Talley—all of whom are located in Maryland—for lack of personal jurisdiction

and dismiss all claims against those Defendants without prejudice, and (2) grant the Motions

to Dismiss of Defendants City of Kannapolis, Mecklenburg County, and the claims against

their employees in their official capacities based on a lack of facts pled to support a Monell

claim, and (3) deny the Motions to Dismiss of Defendants Hoehman, Livengood, Prunty, and

Wade in their individual capacities because the briefing requires consideration of matters

outside the pleadings, without prejudice to further consideration of those issues on motions

for summary judgment. The Court also gives notice of its recommended dismissal of the

claims against Defendant City of Newburg *sua sponte* for failure to state a claim upon which

relief may be granted.

## I.  FACTUAL ALLEGATIONS AND CLAIMS

Plaintiff brings this *pro se* civil rights action under 42 U.S.C. § 1983, alleging violations of the First, Fourth, Fifth, and Fourteenth Amendments.  (Compl. [Doc. # 1] ¶¶ 47-48.)  These claims appear to grow out of a dispute between Plaintiff and the Mecklenburg County Department of Social Services (hereinafter "MCDSS") relating to custody of her adult special needs son, Spencer Stratton.  In the Complaint, Plaintiff alleges that (1) an MCDSS social worker created a fraudulent missing person report which reported that Plaintiff's son was missing when he was not, which in turn (2) gave Kannapolis Police Department Officers the pretext to go to Plaintiff's house in North Carolina and detain her despite knowing that the missing person report was fraudulent, and (3) further use the missing person report to prepare a false police report and enter Plaintiff's vehicle information into the National Crime Information Center (hereinafter "NCIC"), despite knowing that Plaintiff's son was not missing and having no other suspicion of illegality, which finally (4) resulted in Plaintiff's detention and arrest in Charles County, Maryland based on the information in the NCIC and (5) Plaintiff's son's being held by Charles County Department of Social Services (hereinafter "CCDSS") employees before being returned to North Carolina and the custody of MCDSS.[1]

The Court sets out here the facts as alleged in the Complaint.  Plaintiff alleges that on January 24, 2020, Defendant Marty Prunty, a MCDSS social worker, created a fraudulent

---

[1]  Plaintiff repeatedly states that her information was entered into the "NCIS."  (Compl. ¶¶ 2, 4, 8, 74-76, 79-80, 160, 171, 198, 206-207, 237, 271, 320.)  Based on the later  briefing, it is clear that Plaintiff intended to refer to the NCIC, which "is a computerized index of criminal justice information available to, and updated by, federal, state, and local law enforcement agents" and which "law enforcement officials across the country can access . . . to help them apprehend fugitives, locate missing persons, and perform their official duties more safely."  United States v. McDowell, 745 F.3d 115, 118 (4th Cir. 2014) (internal brackets and quotations omitted).

missing person report about Plaintiff's son based on a prior missing person alert that had been issued and cancelled by the Charlotte Mecklenburg Police Department over six months prior. (Compl. ¶¶ 5-7, 75, 172; Compl. Ex. 2 [Doc. #1-3].) Plaintiff alleges that Defendants knew that the 2019 missing person report had been cancelled and "was never re-activated." (Compl. ¶ 7.) Plaintiff alleges that Defendant Tyron Wade, the County Attorney for Mecklenburg County, then hired private investigators to surveil Plaintiff and her home, "with the intent of a warrantless illegal unlawful removal of [her son] from Plaintiff's custody without legal process." (Compl. ¶ 52.)

Plaintiff alleges that Police Officers from the City of Kannapolis, where Plaintiff lived, used this fraudulent missing person report to unlawfully detain, seize, and falsely imprison her in her own home on January 24, 2020. (Compl. ¶¶ 1, 15, 51-76, 172; Compl. Ex. 1 [Doc. # 1-2].) Plaintiff alleges that on that date, multiple officers—including Defendants James Livengood and Matthew Hoehman—arrived at her house and surrounded it for approximately forty minutes while Plaintiff and her son were inside. (Compl. ¶¶ 51-55; Compl. Ex. 1.) Plaintiff contends that she exited the house with her son, entered her car, and began to leave. (Compl. ¶ 55.) Plaintiff alleges that at that point, Defendant Livengood approached Plaintiff and spoke to her about a missing person's report for "Spencer Stratton" while other officers blocked her car in the driveway. (Compl. ¶¶ 56-58.) According to the Complaint, Plaintiff stated that there was no missing person report for "Spencer Stratton" and that a prior similar report had been canceled on July 17, 2019 and was never re-issued. (Compl. ¶ 59.) Plaintiff alleges that she asked to see proof of any current missing person report, and that Defendant Livengood did not produce any such report. (Compl. ¶¶ 60-62.) Plaintiff alleges that

Defendant Livengood did not have any order, warrant, or other legal paperwork to be on her property or prevent her from leaving. (Compl. ¶ 62.) According to the Complaint, Defendant Livengood told Plaintiff that because he had "seen Plaintiff's son for himself" he was therefore going to "remove his name out of an alleged internal 'missing report'." (Compl. ¶ 63.) However, Plaintiff alleges that Defendant Livengood and the other officers did not leave and rather took pictures of Plaintiff, Plaintiff's son, and Plaintiff's license plate. (Compl. ¶¶ 64-72.) The officers then permitted Plaintiff to drive away with her son. (Compl. ¶ 72.) According to the Complaint, Defendant Hoehman filed a report on the same date with a notation for "further investigation" rather than "located, resolved and closed," and the report listed Plaintiff's vehicle information. (Compl. ¶¶ 73, 78; Compl. Ex. 1.) Plaintiff alleges that the Kannapolis Police Department Defendants then "fraudulently" entered Plaintiff's license plate information into the NCIC. (Compl. ¶¶ 1-2, 8, 12, 74-79.) Plaintiff alleges that the NCIC "'missing person' entry was made even though no missing person alert existed" for Plaintiff's son, and that this was a "fraud NCIC entry." (Compl. ¶¶ 75, 79.)

On February 2, 2020, Plaintiff left North Carolina due to what she alleges was ongoing police harassment, and moved with her son to Virginia, just outside of Maryland. (Compl. ¶ 81.)

According to the Complaint, on March 9, 2020, while Plaintiff was travelling in Maryland with her son, Defendant Patrick Hart of the Maryland Transit Authority (hereinafter "MDTA") stopped her car. (Compl. ¶ 82.) Plaintiff alleges that Defendant Hart immediately looked in the vehicle, saw Plaintiff's son, and asked if he was "Spencer Stratton" who was missing. (Compl. ¶ 86.) Plaintiff responded that there was no missing person report. (Compl.

4

¶ 87.)  Plaintiff alleges that Defendant Hart then called the "issuing agency" in North Carolina and spoke to Defendant Prunty.  (Compl. ¶¶ 88-91.)  Defendant William Harris of the MDTA then arrived on scene.  (Compl. ¶ 92.)  Plaintiff alleges that she showed both officers the cancelled July 17, 2019, Silver Alert.  (Compl. ¶ 93.)  According to the Complaint, Defendant Harris acknowledged the information in the cancellation but did not give it credit because he was relying on "information from the NC agency issuing this report" that was the basis for the stop.  (Compl. ¶¶ 94-96, 122-124, 162-163.)  Defendants Harris and Hart stayed on scene for approximately two hours while Defendant Harris continued to speak with the issuing agency in North Carolina.  (Compl. ¶ 97-117.)  Plaintiff alleges that Defendant Harris then ordered Officer Hart to arrest Plaintiff.  (Compl. ¶¶ 124-127.)  Plaintiff alleges that she was arrested for "hindering/obstructing" for failing to provide her driver's license, when none of the officers had ever requested her driver's license.  (Compl. ¶¶ 83-85, 113-116, 125-126, 258.)

According to the Complaint, Defendants Botfort and Bagwell of the Charles County Sheriff's Department, who had arrived on scene at some unspecified point, then searched Plaintiff and removed Plaintiff's son from the vehicle and brought him to the CCDSS's Child Protective Services department.  (Compl. ¶¶ 128-138.)[2]

Plaintiff alleges that she remained in custody overnight and was released the next day and went to the CCDSS to attempt to retrieve her son.  (Compl. ¶¶ 138-140.)  However, Plaintiff contends that Defendant Kelly Beswick of the CCDSS told Plaintiff that MCDSS had already arrived and taken custody of Plaintiff's son.  (Compl. ¶¶ 141-143.)  According to the

---

[2]  Plaintiff lists MDTA Officers Daniel Harmon and Paul Jerry and Charles County Deputy G. Fields as Defendants (Compl. ¶¶ 35, 36, 44), but does not make any factual allegations relating to them, or even allege that they were on scene on March 9, 2020.

5

Complaint, Defendants Beswick, Mary Cupples, and Laura Talley of the CCDSS had all seen an "MCDSS guardianship letter" faxed from the Charles County Sheriff's office after Plaintiff's arrest before releasing Plaintiff's son to MCDSS. (Compl. ¶¶ 145-147.)

According to Plaintiff, this MCDSS guardian letter was fraudulent, and was based on a court order that Plaintiff contends was not in effect. (Compl. ¶¶ 147-148, 153; Compl. Ex. 3 [Doc. #1-4]; Compl. Ex. 4 [Doc. #1-5].) Moreover, Plaintiff alleges that a true guardian letter does not exist and that MCDSS sent a "custom made" letter to the Defendants in Maryland, and Plaintiff describes the letter as Defendant "Prunty's fraudulent guardianship letter." (Compl. ¶¶ 149-150, 152.) Plaintiff further alleges that the Charlotte Mecklenburg Police Department had rejected prior efforts by Defendant Purty to execute a guardianship order that was "not valid." (Compl. ¶ 152.)

The encounter on March 9, 2020, led to a prosecution against Plaintiff for "hindering/obstruction" in Maryland for allegedly failing to present her driver's license during the stop. (Compl. ¶¶ 3, 8, 10, 15, 82, 154.) Plaintiff alleges that three weeks later, the Maryland State's Attorney Office requested a certified copy of the guardianship letter from MCDSS, and Plaintiff further contends that MCSSS never produced a certified copy of the letter. (Compl. ¶¶ 147-148.) Plaintiff was found not guilty of the hindering/obstruction charge on December 3, 2021. (Compl. ¶¶ 4, 10, 154-157.)

As a result of the above alleged conduct, Plaintiff brought the instant suit raising fifteen claims under 42 U.S.C. § 1983:

I.      A First Amendment Denial of Familial Association claim against Mecklenburg County, Mecklenburg Attorney Wade, and MCDSS employee Prunty related to their denial of "Plaintiff's right to care, custody and control of Plaintiff's son without legal process," specifically based on the allegations that Defendant

6

Prunty issued a fraudulent missing person report and created a fraudulent guardianship letter, and that Defendants Prunty and Wade intentionally and maliciously used fraudulent documents to take custody of her son without legal process. (Compl. ¶¶ 168-175);

II.  A Fourteenth Amendment Equal Protection claim against Mecklenburg County, Mecklenburg Attorney Wade, and MCDSS employee Prunty, related to their "intentionally and purposefully singl[ing] out Plaintiff for discriminatory treatment" by repeatedly using fraudulent documents and listing her as an "unauthorized custodian" without proof that MCDSS had custody of her son (Compl. ¶¶ 176-182);

III. A claim against Mecklenburg County, Mecklenburg Attorney Wade, MCDSS employee Prunty, Kannapolis Police Officer Livengood, the City of Kannapolis, Charles County, the City of Newburg, and MDTA Officers Hart, Harris, Harmon, and Jerry, for relying on "fraud, counterfeit legal fiction papers" from MCDSS to remove Plaintiff's son from her "care and custody" and again alleging claims against Defendants Prunty and Wade for issuing a fraudulent missing person report and transmitting a counterfeit guardianship letter (Compl. ¶¶ 183-195);

IV.  A claim alleging fraud against Officer Livengood and the City of Kannapolis, for filing a "fraudulent missing person police report alleging Plaintiff's son was missing" and fraudulently entering "Plaintiff's license plate tag into the NCI[C]," thereby subsequently denying her the "right to care, custody and control of Plaintiff's son without legal process" (Compl. ¶¶ 196-201);

V.   A Fourth Amendment unlawful seizure <u>Monell</u> claim for municipal liability against the City of Kannapolis related to officers' surrounding her home on January 24, 2020, without a warrant and without probable cause or reasonable suspicion that she had engaged in any criminal activity, and related to officers' subsequently making a fraudulent police report and fraudulent NCIC entry (Compl. ¶¶ 202-208);

VI.  A failure to train <u>Monell</u> claim against the City of Kannapolis based on the alleged First, Fourth, and Fourteenth Amendment violations of its officers on January 24, 2020 (Compl. ¶¶ 209-215);

VII. A failure to train <u>Monell</u> claim against the City of Newburg based on the alleged First, Fourth, and Fourteenth Amendment violations of MDTA officers Harmon, Harris, Hart, and Jerry (Compl. ¶¶ 216-224);[3]

VIII. A purported supervisory-liability claim against Officer Livengood related to the Kannapolis Police Department's alleged First, Fourth, and Fourteenth Amendment violations on January 24, 2020 (Compl. ¶¶ 225-234);

IX. A retaliation claim against Officers Livengood and Hoehman, the City of Kannapolis, Mecklenburg Attorney Wade, and MCDSS employee Prunty related to their filing false reports against Plaintiff and illegally entering her information in the NCIC in retaliation for Plaintiff attempting to exercise a familial relationship with her son (Compl. ¶¶ 235-242);

X. A First Amendment Denial of Familial Association claim against Charles County, Deputies Bagwell, Botfort, and Fields, and CCDSS employees Beswick, Cupples, and Talley related to Plaintiff's arrest and the prevention of her exercising her First Amendment right to "custody and control" of her son without verifying the legitimacy of the documents from MCDSS (Compl. 243-251);

XI. A Fourth Amendment unlawful arrest claim against Officers Harmon, Harris, Hart, and Jerry, the City of Newburg, Officers Livengood and Hoehman, and the City of Kannapolis related to her arrest in Maryland for "hindering/obstruction" (Compl. ¶¶ 252-273);

XII. A Fourth Amendment malicious prosecution claim against Officers Harmon, Harris, Hart, and Jerry, the City of Newburg, and Charles County related to the state-court prosecution for "hindering/obstruction" following her arrest in Maryland (Compl. ¶¶ 274-288);

XIII. A purported failure to intervene claim against Officer Hoehman related to the alleged failure to intervene in the unlawful detainment and false imprisonment by Officer Livengood and others on January 24, 2020 (Compl. ¶¶ 289-299);

XIV. A purported failure to intervene claim against Charles County and Deputies Bagwell, Botfort, and Fields related to Plaintiff's March 9, 2020 arrest for "hindering/obstruction" (Compl. ¶¶ 300-312); and

---

[3] The City of Newburg, Maryland, has not yet responded to the Complaint and default has been entered against it [Doc. #143]. The Complaint makes no specific allegations against this municipality. Despite not hearing from the City of Newburg, the Court will *sua sponte* consider the claims against it below in its discussion of the other Defendants from Maryland.

XV.     A Fourth Amendment unlawful search claim against Deputies Bagwell and Botfort, Charles County, Officer Livengood, and the City of Kannapolis related to the search of Plaintiff's car in Maryland on March 9, 2020 (Compl. ¶¶ 313-322).

II.    <u>DISCUSSION</u>

Defendants bring various challenges to the Complaint in their Motions to Dismiss, but they can be grouped into two categories: the motions of the Defendants from Maryland who challenge the Complaint largely on personal jurisdiction grounds [Doc. #19, #39, #41, #72, #130], and the Defendants from North Carolina who challenge the Complaint largely on timeliness and failure to state a claim [Doc. #47, #101].[4]

As discussed below, the Court will recommend (1) that all claims against the Defendants from Maryland—Bagwell, Beswick, Botfort, Charles County, City of Newburg, Cupples, Fields, Harris, Harmon, Hart, Jerry, and Talley—be dismissed without prejudice; (2) that the claims against Defendants City of Kannapolis, Mecklenburg County, and their employees in their official capacities be dismissed based on the lack of facts pled to support a <u>Monell</u>[5] claim; and (3) that the claims against Defendants Hoehman, Livengood, Prunty, and

---

[4] Maryland Defendants Beswick, Talley, and Cupples filed a Motion to Dismiss [Doc. #69], but then shortly thereafter filed an Amended Motion to Dismiss [Doc. #72], so the first Motion to Dismiss [Doc. #69] will be terminated. Similarly, the Kannapolis Defendants filed a Motion to Dismiss [Doc. #36], an Amended Motion to Dismiss [Doc. #65], and then a Second Amended Motion to Dismiss [Doc. #101] replacing the prior Motions, so those earlier Motions [Doc. #36, #65] will be terminated. There is also a Second Motion to Dismiss [Doc. #130] by Maryland Defendants Bagwell, Botfort, Fields, and Charles County, adding additional arguments, but the Court recommends dismissal of those Defendants for lack of personal jurisdiction and therefore need not reach the additional arguments raise in the Second Motion to Dismiss.

[5] <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 & n.55 (1978).

Wade in their individual capacities be considered on motions for summary judgment because the briefing requires consideration of matters outside the pleadings.[6]

A.    Maryland Defendants

 i.    Failure to state a claim against the City of Newburg

 As an initial matter, the Court recommends that all claims against the City of Newburg, Maryland be dismissed *sua sponte* for failure to state a claim, after permitting the Parties an opportunity to respond to this Recommendation. A review of the Complaint, with all factual allegations accepted as true, reveals that Plaintiff specifically alleges that Defendants Harmon, Harris, Hart, and Jerry are officers of the state MDTA. (Compl. ¶¶ 33-36.) Yet, without explanation, Plaintiff summarily attributes their conduct to the City of Newburg, a municipality that is not otherwise described in the Complaint. The Complaint alleges that the traffic stop leading to Plaintiff's arrest took place in LaPlata, Maryland (Compl. ¶ 244), and names no employee or officer from the City of Newburg. Moreover, the relevant officers themselves have acknowledged that they are state employees of the MDTA (Hart's Br. [Doc. #20] at 1; MDTA Defs.'s Br. [Doc. #40] at 1), and Plaintiff does not contest that fact, either through the allegations in the Complaint or in her responsive papers.

 A district court may *sua sponte* conclude that a complaint should be dismissed for failure to state a claim as long as the parties are "given both notice of the court's intention and an opportunity to respond." Webb v. E.P.A., 914 F.2d 1493 (Table), 1990 WL 139665, at *1 (4th Cir. 1990) ("If a court concludes that a complaint should be dismissed *sua sponte* for failure to

---

[6] The Court notes that, as set out in a prior Order [Doc. #88], Plaintiff has voluntarily dismissed the claims against Defendants Bourgeois, Caudle, Eller, Lerch, Johnston, McCheren, and Willis, none of whom were served. Plaintiff continues to affirm that those Defendants were voluntarily dismissed, and the Court therefore does not address them further.

state a claim, the parties must be given both notice of the court's intention and an opportunity to respond."); accord Robertson v. Anderson Mill Elementary Sch., 989 F.3d 282, 291 (4th Cir. 2021). Here, considering Plaintiff has failed to allege any conduct by the City of Newburg or any of its employees—and in fact acknowledges that Defendants Harmon, Harris, Hart, and Jerry are MDTA employees—all claims against the City of Newburg should be dismissed without prejudice after allowing Plaintiff an opportunity to respond to this Order and Recommendation related to the Court's intention to dismiss. In light of the determination that Plaintiff's claims against Defendant City of Newburg should be dismissed for failure to state a claim, the Court further concludes that default [Doc. #143] be set aside as against Defendant City of Newburg under Federal Rule of Civil Procedure 55(c).[7] See Tunstall v. Perry, No. 1:15CV226, 2018 WL 1320265, at *4 (M.D.N.C. Jan. 5, 2018), report and recommendation adopted, No. 1:15CV226, 2018 WL 1311532 (M.D.N.C. Mar. 13, 2018), aff'd, 735 F. App'x 75 (4th Cir. 2018).

### ii. Personal Jurisdiction over remaining Maryland Defendants

All remaining Defendants who are based in Maryland—Charles County, Charles County Deputies Bagwell, Botfort, and Fields, MDTA Officers Harmon, Harris, Hart, and Jerry, and CCDSS employees Beswick, Cupples, and Talley (hereinafter "Maryland Defendants")—move for dismissal for lack of personal jurisdiction under Rule 12(b)(2), among other grounds. (Hart's Br. at 3-6; MDTA Defs.'s Br. at 6-12; CCDSS Defs.'s Br. [Doc.

---

[7] Rule 55(c) allows a court to set aside an entry of default for good cause, including where a Defendant has a meritorious defense. Payne ex rel. Estate of Calzada v. Brake, 439 F.3d 198, 204 (4th Cir. 2006). A court may exercise its discretion to set aside default *sua sponte*. Lindemann-Moses v. Jackman, 644 F. Supp. 3d 163, 177-78 & n.4 (M.D.N.C. 2022); Lewis v. Jordan, No. 1:09CV21, 2011 WL 13239040, at *3 (M.D.N.C. Apr. 6, 2011).

#73] at 9-11; Charles Cnty. Defs.' Br. [Doc. #43] at 6-11.) In essence, all Maryland Defendants argue that, even accepting the allegations in the Complaint as true, none of the Maryland Defendants are North Carolina residents and their conduct occurred solely within Maryland and thus there is no basis for the Middle District of North Carolina to exert either general or specific personal jurisdiction over them. The Court agrees and recommends that all claims against the Maryland Defendants be dismissed without prejudice.

Once a defendant "contests personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of demonstrating personal jurisdiction." Dmarcian, Inc. v. Dmarcian Eur. BV, 60 F.4th 119, 131 (4th Cir. 2023) (internal quotation omitted).

> When a court's personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence. If the existence of jurisdiction turns on disputed factual questions the court may resolve the challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question. But when, as here, the court addresses the question on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge. In considering a challenge on such a record, the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.

Combs v. Bakker, 886 F.2d 673 (4th Cir. 1989) (internal citations omitted); see also UMG Recordings, Inc. v. Kurbanov, 963 F.3d 344, 350 (4th Cir. 2020); Grayson v. Anderson, 816 F.3d 262, 268 (4th Cir. 2016).

Personal jurisdiction requires both that the state's long-arm statute and constitutional due process are satisfied. See, e.g., Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558-59 (4th Cir. 2014). In North Carolina, these considerations are co-extensive, and thus

normally the ultimate determination is whether constitutional due process is satisfied.  See Fadia v. Fadia, No. 1:20CV1006, 2022 WL 3280059, at *3 (M.D.N.C. June 21, 2022), report and recommendation adopted, No. 1:20CV1006, 2023 WL 422890 (M.D.N.C. Jan. 26, 2023), aff'd and modified on other grounds, No. 23-1161, 2023 WL 3598599 (4th Cir. May 23, 2023).  Under the Due Process Clause, a federal court may have general personal jurisdiction over a defendant domiciled in the forum state or specific personal jurisdiction over a defendant based on the defendant's specific conduct in connection with the forum state related to the plaintiff's claims.  Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924 (2011).

The Fourth Circuit has recognized that "fairness is the touchstone of the jurisdictional inquiry," and has adopted "a three-part test to determine whether the exercise of specific personal jurisdiction over a nonresident defendant comports with the requirements of due process" under which a court should analyze: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims arose out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable."  Universal Leather, 773 F.3d at 559 (internal brackets and quotations omitted).  "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State."  Walden v. Fiore, 571 U.S. 277, 286 (2014) (internal quotation omitted).  "Importantly, the specific jurisdictional inquiry 'focuses on the relationship among the defendant, the forum, and the litigation.'"  Farrar v. McFarlane Aviation, Inc., 823 F. App'x 161, 163 (4th Cir. 2020) (quoting Walden, 571 U.S. at 284).

13

Here, with respect to general jurisdiction, the Complaint does not allege that any Maryland Defendant is a resident of North Carolina or otherwise has continuous and systematic activities in this state. (See generally Compl. ¶¶ 32-50.) Moreover, the summonses issued to the Maryland Defendants, Plaintiff's affidavits and other proofs of service, Plaintiff's affidavits of fact and attachments related to service, and Plaintiff's motions for assistance in service all list Maryland addresses for the Maryland Defendants. In the Complaint and Plaintiff's responsive filings she alleges that this Court has personal jurisdiction over the Maryland Defendants based on their conduct in this case and the federal nature of the claims. Therefore, Plaintiff has entirely failed to even allege a prima facie case for general jurisdiction in North Carolina over any of the Maryland Defendants. See Pandit v. Pandit, 808 F. App'x 179, 184 (4th Cir. 2020); McIntosh v. Jacobs Tech., No. 1:15CV970, 2016 WL 4487777, at *4 (M.D.N.C. Aug. 25, 2016).

With respect to specific jurisdiction as to the claims against the Maryland Defendants, the Complaint only alleges that two Maryland Defendants—Officers Hart and Harris of the MDTA—made the decision to contact anyone in North Carolina. (Compl. ¶¶ 82-92, 96, 98, 104, 117, 120.) As set out above, Plaintiff alleges that during the traffic stop in March 2020 in Maryland, these Defendants accessed NCIC, and based on a missing person report, Defendant Hart called the "issuing agency" in North Carolina, and he and Defendant Harris relied on "information from the NC agency issuing this report." In terms of any other possible contact between the Maryland Defendants and North Carolina, the Complaint next alleges that CCDSS employee Beswick received an MCDSS guardianship letter from the "Charles County Sheriff's office"—and that fellow CCDSS employees Cupples and Talley saw this letter.

14

(Compl. ¶¶ 145, 147.) Finally, as to the remaining Maryland Defendants—Charles County and its Deputies Bagwell, Botfort, and Fields, and MDTA Officers Harmon and Jerry—Plaintiff does not allege that they made any contact with North Carolina, either by accessing the NCIC, contacting a North Carolina agency, or receiving anything from North Carolina. As to these remaining Maryland Defendants, the Complaint alleges only that Botfort and Bagwell were on scene and searched and seized Plaintiff's vehicle during her arrest in Maryland and prevented Plaintiff's son from getting into a police car with her. (Compl. ¶¶ 128, 130-131.) The Complaint makes no factual allegations about anything Deputy Fields, Officer Harmon, or Officer Jerry may have done, and certainly makes no allegation that they ever had even passing contact with North Carolina.[8]

In evaluating these issues, the Court finds persuasive the factually-similar case of Cook v. Holzberger from the United States District Court for the Southern District of Ohio. In Cook, the plaintiff was arrested in Michigan by members of a Michigan sheriff's office on the basis of an arrest warrant issued in Ohio. Cook v. Holzberger, 788 F. Supp. 347, 348 (S.D. Ohio 1992). The arresting officers "received the warrant through the National Crime Information Center ('NCIC') computer network." Id. Upon his arrest, the plaintiff "immediately and repeatedly informed the officers" that their information forming the basis

---

[8] The Court notes that there may be some question whether North Carolina's long arm statute would even extend to these claims, where neither the injury nor the injuring act occurred in North Carolina. Notably, in the Complaint Plaintiff alleges that she had relocated out of North Carolina at the time of her arrest in Maryland, and, of course, Plaintiff's arrest in Maryland and the resultant separation from her son during that time did not occur in North Carolina. Thus, as alleged, these are out-of-state injuries to an out-of-state plaintiff based on an out-of-state encounter. In her briefing, Plaintiff contends that she was still a North Carolina resident and that she suffered later-resulting injury in North Carolina. The Court need not consider this issue further because even if the Court accepts Plaintiff's later contention that she was still a North Carolina resident, she has failed to establish a basis for specific jurisdiction over the Maryland Defendants as discussed above.

of the arrest was incorrect and that he was not the same person who was wanted for arrest. See id. The plaintiff was extradited to Ohio where the charges against him were eventually dismissed. Id. The plaintiff brought a § 1983 suit in the Southern District of Ohio against the Ohio officers who entered his information into the NCIC and against the Michigan officers who had arrested him based on that information. Id. The court applied Ohio's long-arm statute—which "extend[ed] to the outer limits of due process"—and found that the court did not have personal jurisdiction over the Michigan sheriff's department and its officers. Id. at 349-51. The court reasoned that the Michigan sheriff's department had not purposefully availed itself of Ohio law and that, in any event, it would be unreasonable to exert personal jurisdiction over it:

> In this case, the [Michigan] Sheriff's Department did not solicit [the plaintiff's] arrest by entering his name into the computer. It merely checked the computer, and arrested [the plaintiff] upon finding the entry. . . . [The Michigan] Sheriff's Department arrested [the plaintiff] only once, and did not have an on-going relationship with the forum state. On the other hand, once [the plaintiff] was arrested, the [Michigan] Sheriff's Department communicated with [Ohio] officials regarding [the plaintiff's] extradition. We must conclude, however, that exercising personal jurisdiction under these circumstances is neither appropriate nor advisable.
>
> The Federal Bureau of Investigation established the NCIC computer system to enable law enforcement officers in other jurisdictions to apprehend fleeing suspects. This system provides a vital service. Liberal use of the NCIC system to apprehend suspects and bring them to justice before additional crimes are committed must be encouraged. In addition, simply accessing the information available through the NCIC system is insufficient to constitute "purposeful availment." Moreover, to conclude otherwise would subject law enforcement officers to personal jurisdiction in every state.

Id. at 351.

The Court also finds highly persuasive two decisions from fellow district courts in the Fourth Circuit. In Rommy v. Friedman, the plaintiff was incarcerated in West Virginia when

16

two defendant federal attorneys in Washington, D.C filed a request to extradite the plaintiff to the Netherlands. <u>Rommy v. Friedman</u>, No. 3:17-CV-6, 2018 WL 1079614, at *1-2 (N.D.W. Va. Jan. 31, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-6, 2018 WL 1082845 (N.D.W. Va. Feb. 26, 2018). The plaintiff filed suit in West Virginia alleging that, during delays in the extradition process, "on various dates between February 2008 through August 2016" the defendants "conspired to punish him by denying his right to pursue extradition to the Netherlands pursuant to an extradition treaty" by "delay[ing] his extradition." <u>Id.</u> at *1-3. In finding that the court in West Virginia did not have personal jurisdiction over the defendants from Washington, D.C., the court noted that "Plaintiff has failed to assert any contact by Defendants with the State of West Virginia," other than "telephone calls with Assistant United States Attorneys who work in the Northern District of West Virginia and sending mail to West Virginia where Plaintiff was incarcerated." <u>Id.</u> at *8 & n.11 (internal citations omitted). These contacts were not sufficient to satisfy the Due Process Clause and the court thus found dismissal was proper for lack of personal jurisdiction. <u>Id.</u> at *8.

In <u>Young v. Nickols</u>, the plaintiff violated the terms of probation from a South Carolina case and was subsequently detained in Ohio in August 2002 at the request of South Carolina officers until he was returned to South Carolina on December 13, 2002. The plaintiff brought suit in South Carolina against the South Carolina and Ohio officers, alleging improper extradition. The court found that it did not have personal jurisdiction over the Ohio officers and therefore recommended that the claims against them be dismissed. <u>Young v. Nickols</u>, 6:03-3640-17AK, at 3-6 (D.S.C. Dec. 23, 2003), <u>report and recommendation adopted</u>, 6:03-3640-17AK (D.S.C. Feb. 19, 2004), <u>rev'd on other grounds</u>, 413 F.3d 416 (4th Cir. 2005).

17

The Court is aware of—and Plaintiff has provided—no case where the act of arresting a person out-of-state based on a forum state's NCIC entry grants the forum state jurisdiction over the arresting officers.[9]  Based on the analysis set out in Cook, Rommy, and Young, the actions alleged here would not establish a basis for personal jurisdiction in North Carolina over the Maryland Defendants.  As set out in Cook, officers routinely access NCIC, and Officer Hart and Harris doing so would not constitute purposeful availment of the privilege of conducting activity in the states from which warrants or orders may have issued.  Similarly, a call or follow-up communications with the agency issuing a warrant or order would not create a basis for personal jurisdiction in the issuing state.  To hold otherwise would dramatically expand the obligation of officers to defend themselves in every state based only on their actions enforcing warrants or orders from other states, as set out in Cook.  Moreover, Plaintiff's claims against the MDTA officers in her Complaint are based on her contention that the MDTA officers lacked probable cause to arrest her for failing to identify herself, in

---

[9] The Court notes that, as to the reverse, it may be an open question whether an officer who enters information in the NCIC and provides additional information and contact that results in an arrest in another state may be subject to personal jurisdiction in that state (i.e., in the present case, whether any of the North Carolina Defendants could be subject to personal jurisdiction in Maryland).  Compare Rogers v. City of Hobart, 996 F.3d 812, 820–21 (7th Cir. 2021) ("To require a municipality and a municipal police officer to defend the use of databases employed in the normal course of their work in any jurisdiction where the fugitive decides to travel would certainly impair 'the shared interest of the several States in furthering fundamental substantive social policies' in law enforcement."), Poteat v. Gibson, No. TDC-17-1903, 2018 WL 6413300, at *4 (D. Md. Dec. 6, 2018) (Maryland district court did not have personal jurisdiction over Virginia officer whose Virginia Arrest Warrant led to the plaintiff's arrest in Maryland), Cleveland v. Clayton, No. 6:14-4497-RBH, 2015 WL 4192488, at *4 (D.S.C. July 10, 2015) (no personal jurisdiction in South Carolina over Georgia police officers whose report formed basis of the plaintiff's arrest in South Carolina, even when an unnamed Georgia police officer physically went to South Carolina to transport him after arrest), and Ray v. Simon, No. 4:07-1143-TLW-TER, 2008 WL 5412067, at *16 (D.S.C. Dec. 24, 2008) (filing forms and making phone calls to South Carolina in course of extradition did not grant South Carolina personal jurisdiction over New Jersey law enforcement officers), aff'd, 330 F. App'x 424 (4th Cir. 2009), with Lee v. City of Los Angeles, 250 F.3d 668, 693-94 (9th Cir. 2001) (finding that New York officers purposefully availed themselves of California law when they entered a plaintiff's information into the NCIC and physically travelled to California to extradite him after his arrest in that state).  In contrast, the issue in the present case addresses only the personal jurisdiction over officers receiving NCIC information and related information from an agency in the forum state.

light of her contention that she did identify herself and was never asked for her driver's license. That claim does not arise out of any contact with North Carolina.

Likewise, with respect to the allegation that CCDSS employees received a guardianship letter from North Carolina, such passive receipt of a letter coming into Maryland from outside does not show that these CCDSS employees purposefully availed themselves of the privilege of conducting activity in North Carolina, and CCDSS employees do not render themselves subject to jurisdiction in every state by receiving information from other states. To the extent Plaintiff contends that the CCDSS should have provided here with additional process in Maryland before transferring her son, so that she could establish that she was the proper guardian, that is a separate claim that could possibly be pursued in Maryland but would not create a basis for personal jurisdiction in North Carolina.

The Court also notes that in the briefing, Plaintiff contends that personal jurisdiction should extend to the Maryland Defendants based on their participation in a "civil conspiracy" with the North Carolina Defendants. However, Plaintiff has failed to plausibly allege a civil conspiracy claim. As to Officers Hart and Harris, Plaintiff contends that these officers should have contacted the North Carolina Department of Public Safety rather than the MCDSS. (See Pl. Br. [Doc. #97] at 4-5.) As to the Charles County Defendants, Plaintiff contends that CCDSS employees Beswick, Cupples, and Talley should have questioned the validity of the MCDSS guardianship letter rather than releasing her son to MCDSS on the basis of the letter. (See Pl. Br. [Doc. #99] at 5, 10; Pl. Resp. [Doc. #103] at 5, 10, 18, 21.) Based on these failures, Plaintiff contends that the Maryland Defendants were negligent. However, these contentions do not plausibly allege a § 1983 claim for civil conspiracy and would not form a basis for this

19

Court's assertion of personal jurisdiction over these Maryland Defendants. Plaintiff's remaining allegations of a conspiracy are speculative and conclusory. See Unspam Techs., Inc. v. Chernuk, 716 F.3d 322, 329-30 (4th Cir. 2013) (holding that the plaintiff "would have to rely on more than bare allegations" or allegations that amount to no more than a "logical possibility" that a conspiracy existed, and finding that "the plaintiffs' allegations of conspiracy are conclusory and speculative and do not satisfy the requirements for establishing a conspiracy theory of personal jurisdiction" (internal quotation omitted)).

Further the Court also concludes that it would be unreasonable to exert personal jurisdiction over the Maryland Defendants. The Court notes the burden to the Maryland Defendants in travelling to North Carolina to defend this case outweighs any minimal interest the forum state might have in adjudicating the matter. See Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory", 283 F.3d 208, 213-14 (4th Cir. 2002) (courts must consider the burden on the defendant and the interests of the forum state when deciding whether exerting personal jurisdiction would be reasonable).

Ultimately, Plaintiff's allegations fail to make a prima facie showing that any Maryland Defendant purposefully availed itself of the privilege of conducting activities in North Carolina and, further, it would be unreasonable to exert personal jurisdiction over the Maryland Defendants. For these reasons, the Court recommends that all claims against the Maryland Defendants be dismissed without prejudice. Hong Tang v. Univ. of Balt., 782 F. App'x 254, 256 (4th Cir. 2019) (dismissal on jurisdictional ground is without prejudice). If Plaintiff wants to bring a § 1983 or state law claim against the MDTA Defendants for false arrest or malicious prosecution for arresting and prosecuting her for failing to identify herself, or against the

20

CCDSS employees for failing to provide a hearing or other process that she contends she was due before they transferred her son to MCDSS, she would need to bring those claims in Maryland state or federal court. Therefore:

- In light of the lack of personal jurisdiction, Defendants Bagwell and Botfort's motion to set aside default [Doc. #42] should be granted;

- Defendant Hart's Motion to Dismiss [Doc. #19], Defendants Harmon, Harris, and Jerry's Motion to Dismiss [Doc. #39], Defendants Beswick, Cupples, and Talley's Motion to Dismiss [Doc. #72], and Defendants Charles County, Bagwell, Botfort, and Fields' Motions to Dismiss [Doc. #41, #130] should all be granted on the basis of lack of personal jurisdiction and the claims against these Defendants should be dismissed without prejudice;

- Plaintiff's apparent requests for assistance in serving Defendants Beswick, Cupples, Harris, and Talley [Doc. #95, #96], should be denied as moot.[10]

Because the Court finds that it does not have personal jurisdiction over these Maryland Defendants, their Motions to Dismiss on grounds other than personal jurisdiction are rendered moot.[11]

---

[10] The parties address issues of service of process at length. With respect to the Defendants who have actual notice and have responded on the substance, Plaintiff asks the Court to waive any remaining defects in service, or assist in completing service. Ultimately, regardless of any service issues, and even if the Court waived any remaining defects in service, the Court lacks personal jurisdiction over the Maryland Defendants, for the reasons set out above.

[11] The Court notes that the Maryland Defendants also argue that the official capacity claims are barred by the Eleventh Amendment, and Plaintiff does not appear to dispute that and instead requests that the Court construe the claims against the Maryland Defendants as individual capacity claims. Even so construed, this Court lacks personal jurisdiction, and the claims should be dismissed without prejudice as set out above.

B.    North Carolina Defendants[12]

    i.    Domestic Relations exception and the *Rooker-Feldman* doctrine

The Defendants Mecklenburg County, Prunty, and Wade (hereinafter the "Mecklenburg Defendants"), move for dismissal of all claims against them on the basis that the Complaint is entirely barred by either the domestic relations exception or the Rooker-Feldman doctrine. (Meck. Defs.'s Br. [Doc. #48] at 8-11.)

> The domestic relations exception encompasses
>
> "cases involving the issuance of a divorce, alimony, or child custody decree." Ankenbrandt v. Richards, 504 U.S. 689, 704, 112 S. Ct. 2206, 119 L.Ed.2d 468 (1992). Federal courts "lack power to issue these types of decrees because of the special proficiency developed by state tribunals over the past century and a half in handling issues that arise in the granting of such decrees." Id. The exception is statutory, not constitutional, in nature, and derives from construction of the diversity jurisdiction statute. Id. at 700-01, 112 S. Ct. 2206. Thus, the domestic relations exception "is applied only as a judicially implied limitation on the diversity jurisdiction; it has no generally recognized application as a limitation on federal question jurisdiction." United States v. Johnson, 114 F.3d 476, 481 (4th Cir.1997); see also Atwood v. Fort Peck Tribal Court Assiniboine, 513 F.3d 943, 947 (9th Cir.2008).

Reale v. Wake Cnty. Hum. Servs., 480 F. App'x 195, 197 (4th Cir. 2012).

The Rooker-Feldman doctrine would bar any claims seeking federal review of a state court decision. "The Rooker-Feldman doctrine applies where 'the losing party in state court filed suit in federal court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment.'" Martin v. Ball, 326 F. App'x 191, 194 (4th Cir. 2009) (quoting Exxon Mobil Corp. v. Saudi Basic Indus.

---

[12] The contentions of the North Carolina Defendants overlap, so the Court considers them together by issue here.

Corp., 544 U.S. 280, 291 (2005)).  The Supreme Court has further explained that the Rooker–

Feldman doctrine

> [does not] stop a district court from exercising subject-matter jurisdiction simply
> because a party attempts to litigate in federal court a matter previously litigated
> in state court.  If a federal plaintiff presents some independent claim, albeit one
> that denies a legal conclusion that a state court has reached in a case to which
> he was a party . . . , then there is jurisdiction and state law determines whether
> the defendant prevails under principles of preclusion.

Exxon, 544 U.S. at 293 (internal brackets and quotation omitted); see also Davani v. Va. Dep't

of Transp., 434 F.3d 712, 718 (4th Cir. 2006).

Here, Plaintiff is not bringing a diversity action for custody or child support, nor does

she specifically seek federal court review of a state court judgment.  To the extent that

Defendants point to various other state and federal judgments, those decisions may impact

Plaintiff's claims based on preclusion principles, and Plaintiff cannot use this case to obtain

federal review of a state court custody or guardianship decision.  However, Plaintiff brings

claims against the Mecklenberg Defendants based on what she contends was improper

issuance of a missing person report, and to the extent Defendants point to earlier judgments

Plaintiff takes the position that prior guardianship or custody determinations were not relevant

and that those issues were resolved in July 2019 and should not have resulted in issuance of a

missing person report.  Thus, it is not clear that Plaintiff is a state-court loser seeking to appeal

a state court judgment.  In the circumstances, at this preliminary stage, it does not appear that

this Court would lack jurisdiction under the domestic relations exception or the Rooker-

Feldman doctrine.  Therefore, the Court concludes that the claims against the Mecklenberg

Defendants should not be dismissed on this basis.

ii.     Statute of Limitations

Officers Livengood and Hoehman and the City of Kannapolis (hereinafter "Kannapolis Defendants") move for dismissal on the ground that Plaintiff filed suit outside of the three-year statute of limitations. (Kann. Defs.'s Br. [Doc. #104] at 10-13.)[13]   Their argument is based on the assumption that Plaintiff learned of at least some of the facts underlying her claim on January 24, 2020, when Officers Livengood and Hoehman went to her house in Kannapolis. (Kann. Defs.'s Br. at 11-12.)  Thus, according to the Kannapolis Defendants, Plaintiff's February 1, 2023, Complaint falls outside of the applicable three-year statute of limitations.

The statute of limitations in an affirmative defense, and "[a] court may dismiss a complaint on statute of limitations grounds if the time bar is apparent on the face of the complaint." Sanchez v. Arlington Cnty. Sch. Bd., 58 F.4th 130, 135 (4th Cir. 2023) (internal quotation omitted); see also Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007); accord Dickinson v. Univ. of N.C., 91 F. Supp. 3d 755, 763 (M.D.N.C. 2015).  In § 1983 claims brought in North Carolina, the state's three-year personal injury limitations period applies. Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996); accord Allen v. Mitchell, 841 F. App'x 605, 606 (4th Cir. 2021).

---

[13] All arguments raised by the Kannapolis Defendants in their current motion were also raised in Motions to Dismiss dated April 4, 2023 [Doc. #36], and May 1, 2023 [Doc. #65], which also included arguments that not all of the Kannapolis Defendants had been properly served.  The Kannapolis Defendants have since apparently conceded that the City of Kannapolis, Officer Livengood, and Officer Hoehman have been properly served. (Kann. Defs.'s Br. at 8-10; Hoehman Aff. [Doc. #101-1]; Livengood Aff. [Doc. #101-2].)  Therefore, the Court considers only the most recent motion [Doc. #101], and the prior motions have been superseded and are moot. The Kannapolis Defendants also argue that service of process was improper as to Defendant Caudle. (Kann. Defs.'s Br. at 8-10.)  However, as previously noted, all claims against Defendant Caudle were voluntarily dismissed on May 11, 2023 [Doc. #88].

While the length of the statute of limitations is a matter of the state law, the question of when an action accrues and the statutory period begins to run is a matter of federal law. Wallace v. Kato, 549 U.S. 384, 387-88 (2007); see also Brooks, 85 F.3d at 181. "A federal cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Baldwin v. City of Greensboro, 714 F.3d 828, 839 (4th Cir. 2013) (internal quotation omitted).

Here, several of the claims in the Complaint all deal with the interactions between the Kannapolis Defendants and Plaintiff on January 24, 2020. Plaintiff alleges that Defendants Livengood and Hoehman detained her in her home on January 24, 2020, without reasonable suspicion and without probable cause merely because she was exercising her right to be with her son. (Compl. ¶¶ 202-208, 209-215, 225-234, 289-299.) Plaintiff was present for these actions. Plaintiff interacted with the officers. According to Plaintiff, she showed these officers proof that any missing person report had been cancelled. According to Plaintiff she asked for proof or probable cause at the time and no one provided her any information. (Compl. ¶¶ 7, 9, 59-62, 64-72.) By Plaintiff's own allegations, she apparently believed it was unlawful for police to detain her at the time they allegedly did so. (Compl. ¶¶ 61, 65, 68.) Thus, it appears that any claims against the Kannapolis Defendants for unlawful detention that occurred on her property on January 24, 2020, accrued on that date. See Smith v. McCarthy, 349 F. App'x 851, 857 (4th Cir. 2009) (claims for illegal entry upon property and illegal seizure accrued on date the incident occurred, notwithstanding a related claim that "such illegal acts were in furtherance of [a] conspiracy" to convict the plaintiff); Harding v. Shinseki, No. 5:12-CT-3095-F, 2012 WL 10242641, at *3 (E.D.N.C. Oct. 30, 2012) (claim of discriminatory stop and

25

seizure accrued on the date of the stop and seizure), aff'd, 521 F. App'x 205 (4th Cir. 2013); Plimpton v. Cooper, 141 F. Supp. 2d 573, 576 (W.D.N.C.) (three-year statute of limitations for causes of action based on false arrest and false imprisonment for arrest and traffic stop accrued at the date the incidents occurred), aff'd, 21 F. App'x 159 (4th Cir. 2001); see also Orem v. Gillmore, 813 F. App'x 90, 92 (4th Cir. 2020) (applying statute of limitation for § 1983 false arrest claim from the moment of the arrest).

Plaintiff appears to concede as much, but notes that she brings additional claims against the Kannapolis Defendants based on conduct that she did not learn of until after March 9, 2020. (See Pl. Resp. [Doc. #103] at 2.)[14] In the Complaint, Plaintiff alleges not just that Officers arrived at her house on January 24, 2020, and detained her on the basis of some form of a missing person report, but that they did so while knowing that no such report existed and that they maliciously fabricated such a report, filed a false police report, and placed Plaintiff's information into the NCIC without basis, resulting in her subsequent detention without cause. According to the Complaint, and as reasonably pleaded, Plaintiff did not learn of this fact until March 9, 2020, at the earliest, when she was stopped in Maryland based on what was, according to her, a false report related to the January 24, 2020, interaction. (Compl. ¶¶ 1, 9.) Thus, to the extent there are other facts that would call into question when Plaintiff learned of or should

---

[14] Specifically, Plaintiff concedes that:

> Whether claims resulting from Kannapolis Police initial contact with Plaintiff on 1/24/20 are actionable is debatable. However the subsequent fraudulent entry of Plaintiff's information on the Police report and NCIC entry evoked constitutional violations. Plaintiff only had partial knowledge of NC Defendants January 24, 2020 violations on January 24, 2020. Sometime after March 9, 2020 Plaintiff gained knowledge of Mecklenburg Defendants January 24, 2020 verbal missing and of the January 24, 2020 Kannapolis Police missing person Police incident report, dated January 24, 2020 . . . used to setup Plaintiff's information into the National Crime Information Center, (NCIC).

(Pl. Resp. at 2.)

have learned of the underlying conduct she alleges, those facts are not apparent from the face of the Complaint. Therefore, the Kannapolis Defendants' Motion to Dismiss all of Plaintiff's claims as time-barred should be denied at this time, but can be considered further on summary judgment.

<u>iii.</u>    <u>Actions of Defendants Prunty and Wade</u>

The Mecklenburg Defendants move for dismissal under 12(b)(6) on the basis that the Complaint does not sufficiently allege factual actions taken by Defendants Prunty and Wade to state a claim against them. The Complaint specifically alleges that Defendant Prunty was the person who created the allegedly false missing person report against Plaintiff and this is supported, at least in part, by Plaintiff's reference to the January 24, 2020 police report bearing his name (Compl. Ex. 1 [Doc. #1-2]), and the fact that on March 9, 2020, officers in Maryland were in contact with him about the report itself (Compl. ¶¶ 89-91). Moreover, the Complaint alleges that Defendant Wade directed not just the Kannapolis Defendants to go to Plaintiff's house without probable cause on January 24, 2020, but that he also directed the creation of the false report against Plaintiff. Whether Plaintiff will be able to prove these allegations as a factual matter, she has sufficiently alleged conduct on the part of these Defendants to survive a Motion to Dismiss.

The Mecklenburg Defendants also move for dismissal of the claims against Defendant Wade on the apparent basis that an attorney may never be a defendant in a § 1983 claim. (Meck. Defs.'s Br. at 12 (citing <u>Willingham v. Buncombe Cnty. Jail</u>, No. 1:19-CV-59-FDW, 2019 WL 1331753, at *1 (W.D.N.C. Mar. 25, 2019).) The reasoning in the case on which the Mecklenburg Defendants base that argument—and the cases on which that case relied in

turn—deal with suits by plaintiffs against their former attorneys, and reflect that in that capacity attorneys do not act under color of state law for purposes of a § 1983 suit. See Willingham, 2019 WL 1331753, at *1 (citing Polk County v. Dodson, 454 U.S. 312 (1981); Davidson v. Ratliff, No. 4:11-1072-RBH-SVH, 2011 WL 3678679, at *2 (D.S.C. June 3, 2011)). This reasoning should not be read so broadly as to state that a government attorney may never be sued under § 1983.[15] Thus, to the extent Mecklenburg Defendants seek dismissal of the claims against Defendant Wade on the basis of Willingham, simply because he is an attorney, that motion should be denied.

      iv.    *Monell*

Both the Mecklenburg and Kannapolis Defendants move to dismiss the official-capacity and municipal liability claims against them on the basis that the Complaint fails to adequately plead an unconstitutional custom or policy in Mecklenburg County or in the City of Kannapolis under Monell. (Meck. Defs.'s Br. at 18-22; Kann. Defs.'s Br. at 13-17.)

Under § 1983, municipal liability is limited to action for which the municipality is "actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986). Municipal liability under § 1983 applies to local government entities, including local government officials sued in their official capacity, when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690

---

[15] If the government attorney was acting as a prosecutor, he would be entitled to prosecutorial immunity, since prosecutors have absolute immunity from civil liability for activities in or connected with judicial proceedings such as criminal trials, bond hearings, bail hearings, grand jury proceedings, and pretrial motions hearings. See Imbler v. Pachtman, 424 U.S. 409, 430 (1976) (prosecutors are immune from § 1983 claims where their alleged actions are "intimately associated with the judicial phase of the criminal process"). The Court can consider any issues of immunity on summary judgment motions.

& n.55 (1978).  A local government entity is not liable under § 1983 "*solely* because it employs a tortfeasor."  Id. at 691.

A policy or custom for which municipal liability can arise may be established in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifests deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

Starbuck v. Williamsburg James City Cnty. Sch. Bd., 28 F.4th 529, 533 (4th Cir. 2022) (internal brackets omitted) (quoting Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003)). Cf. Kopf v. Wing, 942 F.2d 265, 269 (4th Cir. 1991) ("Of course, written policies are carefully crafted to be constitutional, and a plaintiff must usually prove the existence of some unpublished practice.").

Defendants contend that Plaintiff has failed to allege a policy or practice that would form a basis for Monell liability.  In response, Plaintiff argues in the briefing that she has alleged municipal liability based on failure to train in a "single incident" theory.  Plaintiff cites to City of Canton v. Harris, in which the Supreme Court noted that:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons.  The city has armed its officers with firearms, in part to allow them to accomplish this task.  Thus, the need to train officers in the constitutional limitations on the use of deadly force, see Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

City of Canton v. Harris, 489 U.S. 378, 390 n.10 (1989); see also Connick v. Thompson, 563 U.S. 51 (2011); Cash v. County of Erie, 654 F.3d 334 (2nd Cir. 2011).  However, Plaintiff has

not alleged such an obvious concern here to state a claim for deliberate indifference based on failure to train by the City of Kannapolis or Mecklenburg County. Plaintiff also does not allege a specific express policy or a practice that is so widespread that it is a custom and practice.

Based on the lack of allegations to support a clam for municipal liability, the clams against the City of Kannapolis and Mecklenburg County should be dismissed. In addition, the claims against Defendants Hoehman, Livengood, Prunty and Wade in their official capacities are duplicative of the claims against the City of Kannapolis and Mecklenburg County and should likewise be dismissed.

> v.     Motion to Dismiss Based on Attached Documents

The Mecklenburg Defendants also argue that Plaintiff has failed to state a claim because state court documents and factual recitations in prior habeas cases reflect that MCDSS had custody over Plaintiff's son and that because Plaintiff abducted him without authorization, they did not violate any constitutional rights of Plaintiff and, if they did, they nevertheless acted reasonably. (Meck. Defs.'s Br. at 23-24.) Based on these factual allegations and attachments, Defendants argue that Plaintiff has failed to state a claim for a constitutional violation. In response, Plaintiff challenges the authenticity of the documents and argues that the recitation of facts from prior cases that were dismissed without prejudice should not be accepted as binding facts at this stage of the case. Plaintiff also contends that regardless of any prior orders, her son's status as a missing person was canceled on July 17, 2019, and that after that date he was not a missing person and was validly in her custody. Plaintiff also

attaches multiple documents and asks the Court to take judicial notice of her documents, and requests an evidentiary hearing regarding the documents.

Having considered the Parties' contentions, the Court has concerns that Defendants' Motions to Dismiss based on facts not alleged in the Complaint, and the consideration of some or all of the documents submitted by the Parties, could result in conversion of the Motions into Motions for Summary Judgment under Rule 12(d), which would require notice and an opportunity for further briefing. Simply converting the present Motions would be unwieldy, however, given the multiple briefs on the docket with various attachments, making it less than clear what is actually being presented for consideration. In the circumstances, it appears that the most effective course would be to allow the Parties to file immediate Motions for Summary Judgment, attaching any documents, affidavits, and other relevant evidence. Therefore, the Court will recommend that the Motions to Dismiss be denied to the extent they rely on additional documents or facts, but that those issues be presented in Motions for Summary Judgment filed within 30 days, with 30 days for responses, and 14 days for replies. Defendants may file Motions for Summary Judgment by March 13, 2024, attaching the documents presented with the briefing as well as any other evidence and affidavits, and raising any arguments in favor of summary judgment that would not require further discovery. The Court anticipates a single Motion and Brief from Defendants Wade and Prunty, and a single Motion and Brief from Defendants Livengood and Hoehman, and those documents should not incorporate any other documents by reference. Plaintiff may file a Response to each Motion by April 12, 2024, attaching any documents, affidavits, and any other evidence, as well as any discovery requests she contends are needed to respond to the Motion for Summary

31

Judgment.[16]  She should file a separate, complete Response to each Motion, and should not incorporate any other document by reference.  Defendants may file Replies by April 26, 2024. Defendants should also file Answers but the Court will review the Motions for Summary Judgment before making a determination as to whether and when to start discovery.

### vi.    Qualified Immunity

The Kannapolis Defendants argue that they are entitled to qualified immunity related to claims that they unlawfully detained Plaintiff at her home on January 24, 2020, because their actions (1) went no further than what any member of the public would be allowed to do in approaching the curtilage of Plaintiff's home and (2) if it did go further, it was not clearly established that the Kannapolis Defendants actions in interacting with Plaintiff were unconstitutional.  (Kann. Defs.'s Br. at 19-22.)  It appears that there may be factual disputes regarding these contentions, specifically regarding the extent to which Plaintiff was precluded from leaving and other actions subsequently alleged to have been taken.[17]  Further, this argument is based in large part on Defendants' alternative factual assertions and reliance on

---

[16] So that this is clear, the Court notes that if Defendants file a Motion for Summary Judgment, Plaintiff should respond to the substance of the Motion and attach any documents, affidavits, and other evidence that she has. If she believes that specific discovery is necessary to respond to the Motion for Summary Judgment, she should also attach the specific discovery she seeks to serve (i.e., the specific interrogatories or document requests) so that the Court can consider the request.  Again, these requests should be limited to only those that Plaintiff contends are necessary to respond to the Motions for Summary Judgment.  If the Motion for Summary Judgment is denied, the Court will allow a period for discovery beyond just the issues raised in the Motion for Summary Judgment.

[17] For example, the Complaint alleges more than that the Kannapolis Defendants interacted with Plaintiff in the curtilage of her home:  it alleges that the Kannapolis Defendants surrounded her home, blocked her in the driveway, prevented her from leaving, and repeatedly ignored her requests to move so that she could leave.  In addition, as to the remaining claims—of retaliation or other unconstitutional action against Plaintiff by filing knowingly false reports and NCIC entries that later led to her arrest— the Kannapolis Defendants make no argument that they are entitled to qualified immunity.  These issues can be further addressed on Motions for Summary Judgment.

32

other documents, rather than the allegations in the Complaint, and these issues can be addressed on Motions for Summary Judgment as discussed above.

The Mecklenburg Defendants also argue that they are entitled to qualified immunity related to the claims against Defendants Prunty and Wade on the basis that, because MCDSS had custody over Plaintiff's son they acted reasonably. (Meck. Defs.'s Br. at 23-24.) However, as discussed above, consideration of the state court judgments and factual assertions by Defendants should be addressed on Motions for Summary Judgment rather than a Motion to Dismiss. The Motions for Summary Judgment can also address the claims against the Mecklenburg Defendants alleging that they fraudulently created a missing person report or other orders against Plaintiff without cause and in retaliation for Plaintiff's spending time with her son.

Thus, the portion of Kannapolis and Mecklenburg Defendants' Motions to Dismiss seeking dismissal on the ground of qualified immunity should be considered on Motions for Summary Judgment, and given the potentially dispositive assertions regarding state court judgments and orders, and the need to address qualified immunity prior to discovery to the extent possible, the Court will allow the consideration of Motions for Summary Judgment as set out above. [18]

---

[18] The Mecklenburg Defendants also moved to dismiss the claims against MCDSS Director John Eller on the basis that he has not been properly served. (Meck. Defs.'s Br at 13.) However, as previously noted, Plaintiff voluntarily dismissed all claims against John Eller and he is no longer a party to this suit [Doc. #88]. Similarly, the pending Motions to Dismiss by the Kannapolis Defendants address claims against Officer Caudle and argue that this officer has not been properly served. However, Plaintiff voluntarily dismissed all claims against Officer Caudle and that officer is no longer a party to this suit [Doc. #88].

vii.    Kannapolis Defendants' Motion to Set Aside Default

The Court also notes that on April 3, 2023, default was entered against the Kannapolis Defendants for failure to respond to the Complaint. The Kannapolis Defendants moved to set aside default the following day, arguing that good cause had been shown to approve the motion because none of the Kannapolis Defendants had been properly served as of April 4, 2023 [Doc. #35]. On the same date, Kannapolis Defendants moved for dismissal, partly on the basis that none of the Kannapolis Defendants had been properly served under Rule 12(b)(2) [Doc. #36, #37]. Twenty-five days later, the Kannapolis Defendants filed an amended Motion to Dismiss, clarifying that Defendants Livengood and Hoehman had in fact been served prior to April 3, 2023, but still arguing that the claims against the City of Kannapolis should be dismissed for improper service under Rule 12(b)(2) [Doc. #65, #66]. On May 30, 2023, Plaintiff filed an affidavit of service showing that she had successfully served the City of Kannapolis's designated agent [Doc. #100]. Two days later, the Kannapolis Defendants filed the currently-pending motion to dismiss in which they again confirmed that Defendants Livengood and Hoehman had been served prior to April 3, 2023, and in which they no longer argued that the claims against the City of Kannapolis should be dismissed for improper service under Rule 12(b)(2) [Doc. #101, #104].

Pursuant to the Federal Rules of Civil Procedure, the "court may set aside an entry of default for good cause." Fed. R. Civ. P. 55(c). "Rule 55(c) motions must be liberally construed in order to provide relief from the onerous consequences of defaults and default judgments." Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc., 616 F.3d 413, 421 (4th Cir. 2010). In determining whether "good cause" has been shown, the Court must consider (1) whether

the moving party has a meritorious defense, (2) whether it acted with reasonable promptness, (3) the personal responsibility of the defaulting party, (4) the prejudice to the non-moving party, (5) whether there is a history of dilatory action, and (6) the availability of less drastic sanctions. Payne ex rel. Estate of Calzada v. Brake, 439 F.3d 198, 204-05 (4th Cir. 2006).

As noted above, the Kannapolis Defendants have potentially meritorious defenses that should be considered on the substance. In addition, while Plaintiff has now successfully served the City of Kannapolis, at the time of entry of default, the City of Kannapolis had not been served. As to Defendants Livengood and Hoehman, Plaintiff will not be prejudiced by setting aside the default because their delay in responding was so minimal, and beyond the initial delay in responding to the Complaint—which was due at least in part to the City of Kannapolis's not having been served—the Kannapolis Defendants have not been dilatory in any of their filings and in fact promptly responded a day after default was entered.

Because the relevant factors weigh in favor of setting aside the default and good cause to do so has been shown, and considering the Fourt Circuit's "strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed of on their merits," Colleton Preparatory Acad., 616 F.3d at 417, the Kannapolis Defendants' Motion to Set Aside Default [Doc. #35] will be granted.

C.     Plaintiff's Motions

Finally, Plaintiff has filed several Motions. First, she has filed a Motion [Doc. #94] requesting assistance from the U.S. Marshals to serve Defendant Livengood, but Defendant

Livengood has since admitted that he was properly served [Doc. #101-2]. Thus, Plaintiff's request for assistance in serving Defendant Livengood [Doc. #94] will be denied as moot.[19]

Second, as noted above, Plaintiff has filed a Motion for Judicial Notice and Hearing [Doc. #144], but no hearing is needed at this stage in the case in light of the above Recommendation, and Plaintiff may present her documents in response to Defendants' Motions for Summary Judgment. If Plaintiff disputes the authenticity of a document filed by Defendants, or otherwise requests consideration of other competing documents or contentions, she will have an opportunity to be heard by presenting an affidavit and documents with her summary judgment response brief.

Finally, Plaintiff filed a Motion for Issuance of Subpoenas [Doc. #155] and a Second Motion for Judicial Notice [Doc. #156]. The requested subpoenas appear to relate primarily to her claim against the Maryland Defendants, and seek documents from entities in Maryland. That request will be denied in light of the recommended dismissal of those Defendants, without prejudice to Plaintiff presenting her request if she re-files claims against the Maryland Defendants in Maryland. In addition, as noted above, Plaintiff may attach her documents and evidence in response to the upcoming Motions for Summary Judgment, and may also attach any specific discovery requests that she believes she needs to respond to the Motions for Summary Judgment. Therefore, Plaintiff's present Motions will be denied.

---

[19] As discussed previously with regard to the Maryland Defendants, Plaintiff's Motions for Assistance [Doc. #95, #96] with service as to the Maryland Defendants will be denied as moot in light of the Recommendation of dismissal for lack of personal jurisdiction.

III.  CONCLUSION

IT IS THEREFORE ORDERED that the Entry of Default against the City of Newburg [Doc. #143] is set aside; that the Motion to Set Aside Default [Doc. #42] by Defendants Bagwell and Botfort is GRANTED, and that the Motion to Set Aside Default [Doc. #35] by Defendants City of Kannapolis, Hoehman, and Livengood is GRANTED.

IT IS FURTHER ORDERED THAT Defendants Beswick, Cupples, and Talley's duplicative Motion to Dismiss [Doc. #69] is terminated as superseded by the subsequent Motion to Dismiss [Doc. #72].

IT IS FURTHER ORDERED that Defendants City of Kannapolis, Hoehman, and Livengood's prior Motions to Dismiss [Doc. #36, #65] are terminated as superseded by the later Second Amended Motion to Dismiss [Doc. #101].

IT IS RECOMMENDED THAT the Motions to Dismiss of Maryland Defendants Hart [Doc. #19], Harmon, Harris, and Jerry [Doc. #39], Beswick, Cupples, and Talley [Doc. #72], and Bagwell, Botfort, Charles County, and Fields [Doc. #41, #130] be GRANTED to the extent that all claims against these Defendants should be DISMISSED without prejudice for lack of personal jurisdiction.

IT IS FURTHER RECOMMENDED that the City of Newburg be DISMISSED as a Defendant on the basis that the Complaint fails to state a claim against that municipality, and the Court gives notice of this intent and an opportunity to respond to this Recommendation.

IT IS FURTHER RECOMMENDED that Defendants Mecklenburg County, Prunty, and Wade's Motion to Dismiss [Doc. #47] be denied as to Defendants Prunty and Wade in

the individual capacities, but granted as to the claims against them in their official capacities and as to the claims against Mecklenburg County based on the failure to state a <u>Monell</u> claim.

IT IS FURTHER RECOMMENDED and that Defendants City of Kannapolis, Hoehman, and Livengood's Motion to Dismiss [Doc. #101] be denied as to the claims against Defendants Hoehman and Livengood in their individual capacities, but granted as to the claims against them in their official capacities and as to the claims against City of Kannapolis for failure to state a <u>Monell</u> claim.

IT IS ORDERED that Defendants Prunty, Wade, Hoehman, and Livengood may file Motions for Summary Judgment by March 13, 2024, attaching the documents presented with the briefing as well as any other evidence and affidavits, and Plaintiff may file a Response to each Motion by April 12, 2024, attaching any documents, affidavits, and any other evidence, as well as any discovery requests she contends are needed to respond to the Motions for Summary Judgment, and Defendants may file Replies by April 26, 2024.

IT IS ORDERED THAT Plaintiff's Motions for Assistance with Service [Doc. #94, #95, #96] are DENIED, and Plaintiff's Motion for an Evidentiary Hearing [Doc. #144], Motion for Subpoenas [Doc. #155] and Motion for Judicial Notice [Doc. #156] are DENIED, without prejudice to further consideration as part of the summary judgment briefing as noted above.

This, the 12th day of February, 2024.

/s/ Joi Elizabeth Peake
United States Magistrate Judge
